UNITED STATES DISTRICT COURT
FOR THE
MIDDLE DISTRICT OF PENNSYLVANIA

RAHN ANDRE JACOBS,      :
                   :
        Plaintiff      :    No. 1:13-cv-2066
                   :
   vs.             :    (Judge Kane)
                   :
DR. WILLIAM YOUNG,     :
                   :
        Defendant     :

**MEMORANDUM**

## I.   Background

On August 2, 2013, Plaintiff Rahn Andre Jacobs filed a civil rights complaint pursuant to 42 U.S.C. § 1983 regarding the quality of medical care he received for a urinary tract condition when incarcerated at the Dauphin County Prison from July 29, 2011 to February 9, 2012, and from September 24, 2012, to March 26, 2013. (Doc. No. 1.) Jacobs contends that the quality of care he received violated his rights under the Eighth Amendment to the United States Constitution. (Id.) Named as the sole Defendant is Dr. William Young, the prison doctor at the Dauphin County Prison.

On September 9, 2015, Dr. Young waived service of the complaint (Doc. No. 11) and on May 15, 2014, filed an answer to the complaint raising affirmative defenses. (Doc. No. 23.) On February 19, 2016, the court set a discovery and dispositive motion deadline. (Doc. No. 39.) After the discovery deadline passed, Dr. Young filed on June 15, 2016, a motion for summary judgment, a statement of material facts in accordance with Local

Rule 56.1, evidentiary materials (including an expert report from
Robert D. Jones, M.D., which was signed under penalty of perjury
pursuant to 28 U.S.C. § 1746), and a supporting brief. (Doc. Nos.
46, 47, 47-1, 48.)

Because Jacobs failed to file a response to Dr. Young's
statement of material facts or a brief in opposition, the court on
July 15, 2016, directed Jacobs to do so within 21 days. (Doc. No.
50.)  Jacobs was advised that in responding to Dr. Young's
statement of material facts he was to either to confirm or deny
each numbered paragraph, and if he denied a paragraph, he was to
refer to parts of the record that supported the denial. (Id.)
Jacobs was further advised that any numbered paragraph in Dr.
Young's statement of material facts that he failed to answer would
be deemed admitted. (Id.)

On July 28, 2016, Jacobs filed a brief in opposition
consisting of 4 pages and along with excerpts from medical records
already made part of the court record by Dr. Young. (Doc. No. 51.)
Jacobs did not submit a separate counter-statement of material
facts.  On August 22, 2016, Jacobs was given a second opportunity
to respond appropriately to Dr. Young's statement of material
facts. (Doc. No. 55.)  On September 15, Jacob filed a second brief
in opposition (Doc. No. 57) to Dr. Young's motion for summary
judgment but did not file a separate response to Dr. Young's
statement of material facts in accordance with the court's order
of August 22, 2016.  Jacobs did not submit any affidavits or

unsworn declarations under penalty of perjury which contravene the evidentiary materials submitted by Dr. Young.  Consequently, the facts set forth in Dr. Young's statement of material facts and evidentiary materials are deemed admitted.[1]  The court will now review those facts and the applicable law to determine whether Dr. Young is entitled to judgment as a matter law.  Furthermore, because Jacobs' briefs in opposition (Doc. Nos. 51, 57) address

---

1.   Local Rule 56.1 states in toto as follows:

> A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

> The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraph set forth in the statement required in the foregoing paragraph; as to which it is contended that there exists a genuine issue to be tried.

> _Statement of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements_.

> _All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing p000arty._

M.D. Pa. LR 56.1 (emphasis added). A standard practice order was issued on August 2, 2013, which advised Jacobs of the requirements of several Local Rules of Court, including Local Rule 56.1. (Doc. No. 6.)  He was also as noted ordered on July 15 and August 22, 2016, to respond to Dr. Young's statement of material facts in accordance with Local Rule 56.1.  Specifically, he was directed to either confirm or deny each numbered paragraph, and if he denied a paragraph refer to parts of the record which supported the denial.

only Dr. Young's alleged deliberate indifference to his medical needs during the first period of incarceration, i.e., July 29, 2011 to February 9, 2012, the court will limit its review of the summary judgment evidence to that period of time.

**II.     Summary Judgment**

Federal Rule of Civil Procedure 56(a) requires the court to render summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law.  Anderson, 477 U.S. at 248; Gray v. York Newspapers, Inc., 957 F.2d 1070, 1078 (3d Cir. 1992).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  Anderson, 477 U.S. at 257; Brenner v. Local 514, United Brotherhood of Carpenters and Joiners of America, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether there is a genuine issue of material fact, the court must view the facts and all reasonable

4

inferences in favor of the nonmoving party. <u>Moore v. Tartler</u>, 986
F.2d 682 (3d Cir. 1993); <u>Clement v. Consolidated Rail Corporation</u>,
963 F.2d 599, 600 (3d Cir. 1992); <u>White v. Westinghouse Electric
Company</u>, 862 F.2d 56, 59 (3d Cir. 1988).  In order to avoid
summary judgment, however, the nonmoving party may not rest on the
unsubstantiated allegations of his or her pleadings.  When the
party seeking summary judgment satisfies its burden under Rule 56
of identifying evidence which demonstrates the absence of a
genuine issue of material fact, the nonmoving party is required by
Rule 56 to go beyond the pleadings with affidavits, depositions,
answers to interrogatories or the like in order to demonstrate
specific material facts which give rise to a genuine issue.
<u>Celotex Corporation v. Catrett</u>, 477 U.S. 317, 324 (1986).  The
party opposing the motion "must do more than simply show that
there is some metaphysical doubt as to the material facts."
<u>Matsushita Electric Industrial Co. v. Zenith Radio</u>, 475 U.S. 574,
586 (1986).  When Rule 56 shifts the burden of production to the
nonmoving party, that party must produce evidence to show the
existence of every element essential to its case which it bears
the burden of proving at trial, for "a complete failure of proof
concerning an essential element of the nonmoving party's case
necessarily renders all other facts immaterial."  <u>Celotex</u>, 477
U.S. at 323.  <u>See</u> <u>Harter v. G.A.F. Corp.</u>, 967 F.2d 846, 851 (3d
Cir. 1992).

III.   <u>**Statement of Material Facts**</u>

The statement of  material facts and the evidentiary
materials, including the expert opinion of Dr. Jones (Doc. Nos.
47, 47-1), to which Jacobs failed to respond, reveal: (1) Dr.
Young is employed by PrimeCare Medical, Inc., a company which has
a contract with Dauphin County to provide medical services to
inmates at the Dauphin County Prison; (2) Jacobs filed a case
against Dauphin County Prison, PrimeCare Medical, Inc., and Doctor
John Doe in the Court of Common Pleas of Dauphin County, docketed
at 2013-CV-7630-MM, with counsel; (3) counsel withdrew from the
Dauphin County case, and it was ultimately dismissed with an entry
of a non pros on October 2, 2014; (4) Jacobs has a history of
urethral stricture disease since at least 1981 and a history of
multiple urethrotomies[2] for that disease which extends throughout
the length of his urethra;[3] (5) the last urethrotomy before

---

2.   A urethrotomy is an operation to treat a narrowing of the
urethra (the tube that carries urine from the bladder to the
penis).  The narrowing (stricture) is usually caused by scar
tissue forming after inflammation, an infection or injury.

3.   Dr. Jones states that Jacobs told medical personnel at
Hershey Medical Center in February, 2012, that in 1981 he
sustained perineal injury as the result of a combat jump accident
while he was serving in the Marines.  Dr. Jones also notes that
Jacobs in May, 2011, at a time when he was not incarcerated told
a physician, Dr. Decter, that he had a history of strictures
since 1981 when he was "in the Army and had an incident while he
was repelling down a rope" but that he received treatment at Reed
Army Hospital in Fort Sill, Oklahoma, and "subsequently did well
from 1981 on for quite awhile." (Doc. No. 47-1, at 8-9.) When
Jacobs was examined at Hershey Medical Center on January 29,
2012, medical personnel reported that Jacobs "was recently seen
(continued...)

Jacob's was incarcerated at Dauphin County Prison was in 2007;[4]
(6) Dr. Jones reviewed Jacobs' medical records and stated in his
report that Jacobs upon being incarcerated at Dauphin County
Prison in March, 2010, was screened by medical personnel; (7)
Jacobs remained confined at the Dauphin County Prison until at
least January 20, 2011; (8) Jacobs was again confined at the
Dauphin County Prison on July 29, 2011, and underwent a medical
screening; (9) during the screening Jacobs reported he was on
prednisone, oxycodone and other medications for rheumatoid
arthritis and osteoporosis, he was allergic to bee stings and
carried an epi pen, and he attempted suicide in 2002; (10) at the
end of the screening Jacobs was provided with an education packet;
(11) on August 1, 2011, Jacobs was examined by a mental health
professional, Dr. Wilson, at which time Jacobs requested
medication for anxiety; (12) on August 12, 2011, Jacobs was
examined by Dr. Young and during that encounter Jacobs complained
of pain in his hands, knees and neck and requested a change in his

---

3.   (...continued)
in consultation for urethroplasty by Dr. Decter however was lost
to follow up due to incarceration." (Id. at 27.)

4.   Jacobs in his brief in opposition takes issue with this
statement by contending that he underwent such a procedure in
April, 2011. Jacobs does not present an affidavit or unsworn
declaration under penalty of perjury or medical records
establishing that he underwent a urethrotomy in April, 2011.
Furthermore, Dr. Jones in his report specifically states that the
last urethrotomy was performed in 2007.  Dr. Jones states,
however, that a urethral dilatation was performed in April, 2011,
which is a different type of procedure.

rheumatoid arthritis medication;[5] (13) based on a physical examination and prior negative blood work Dr. Young's assessment was that Jacobs suffered from rheumatoid arthritis with a negative serology and normal sedimentation rate (ESR);[6] (14) in response to Jacobs' request for a medication change Dr. Young increased Jacob's dosage of prednisone, added the narcotic-like pain medication Ultram and ordered blood testing, including a complete metabolic panel, complete blood count, antinuclear antibody test and sedimentation rate;[7] (15) the results of the blood work which were reviewed by Dr. Young on August 30, 2011, were all normal; (16) on September 8, 2011, Jacobs refused to take his medication; (17) on September 9, 2011, Jacobs was examined by Dr. Young regarding his rheumatoid arthritis; (18) Dr. Young's assessment was that Jacobs suffered from mixed connective tissue disease;[8]

---

5.  Doc. 47-1, at 62.

6.  Id.

7.  Id.

8.  Id.; "Mixed connective tissue disease has signs and symptoms of a combination of disorders - primarily lupus, scleroderma and polymyositis. For this reason, mixed connective tissue disease is sometimes referred to as an overlap disease. . . Early signs and symptoms often involve the hands.  Fingers might swell like sausages, and the fingertips become white and numb.  In later stages, some organs – such as the lungs, heart and kidneys - may be affected.  There's no cure for mixed connective tissue disease.  The signs and symptoms are usually treated with certain medications, such as prednisone." Mixed connective tissue disease, Definition, Mayo Clinic Staff, http://www.mayoclinic.org/diseases-conditions/mixed-connective-tissue-disease/basics/definition/CON-20026515 (Last accessed January 18, 2017).
(continued...)

(19) on October 12, 2011, Jacobs spoke with Dr. Young "in the
waiting room, asking his prednisone be increased;"[9] (20) in
response to that request Dr. Young increased Jacob's dosage of
prednisone;[10] (21) on October 26, 2011, Jacobs was seen by Dr.
Young for a follow up appointment regarding his mixed connective
tissue disease; (22) Dr. Young's assessment remained the same and
he increased Jacobs' dosage of prednisone; (23) on November 25,
2011, Jacobs was seen by Dr. Young for a follow up appointment
regarding his mixed connective tissue disease; (24) at that
appointment Jacobs reported that he was "doing pretty good" and
asserted that he thought they had "found the medium with
prednisone;"[11] (25) Dr. Young's assessment remained the same and
his plan was to start a prednisone taper;[12] (26) on December 21,
2011, Jacobs was seen by Dr. Young for a follow-up appointment

_____

8.   (...continued)
     Rheumatoid arthritis and mixed connective tissue disease are
autoimmune disorders. An autoimmune disorder is a condition that
occurs when the immune system attacks and destroys healthy body
tissue.  There are more than 80 types of autoimmune disorders.
See MedlinePlus Medical Encyclopedia (A service of the U.S.
National Library of Medicine and the National Institute of
Health),https://medlineplus.gov/ency/article/000816.htm (Last
accessed January 18, 2017).

9.   Doc. 47-1, at 46.

10.  Id.

11.  Doc. 47-1, at 63.

12.  An individual cannot abruptly stop taking prednisone.
Instead the amount has to be gradually reduced or tapered.
Withdrawl symtoms include severe fatigue, weakness, body aches
and joint pain.

regarding his mixed connective tissue disease at which time Jacobs reported he was "[s]ore as hell" and that the pain in his knees "went down a little bit since this morning;" (27) Dr. Young's plan was to continue the prednisone taper; (28) on January 18, 2012, Jacobs had a follow-up appointment with Dr. Young regarding his mixed connective tissue disease at which time Jacobs reported that his joints were "inflamed" and the "last two days they blew up" and his "urethra[] [was] shutting down;"[13] (29) Dr. Young performed a physical examination which was normal except Jacobs had knee effusion, Dr. Young's assessment remained mixed connective tissue disease, and he continued the prednisone taper and sent a request for Jacobs' medical records to a urologist, Dr. Deibert, who treated Jacobs in the past; (30) on January 28, 2012, at approximately 9:31 a.m., Jacobs reported urine retention to Brian Druckemiller, a licensed practical nurse; (31) Nurse Druckemiller reported Jacobs' complaint to Dr. Young by phone at approximately 9:33 a.m.; (32) Dr. Young directed that laboratory work be immediately performed, including a urine culture and that Jacobs be placed on the next available provider line; (33) at approximately 1:50 p.m. on January 28, 2012, Susan Miller, a licensed practical nurse, phoned Dr. Young and provided him with the results of a urine dip; (34) based on that report Dr. Young issued an order that Jacobs be provided the antibiotic Cipro, 500 mg., by mouth twice per day and that medical personnel continue to

---

13.  Doc. No. 47-1, at 64.

monitor Jacobs; (35) at approximately 9:25 p.m. Jacobs reported to the medical department and complained to nurse Druckemiller of difficulty urinating; (36) nurse Druckemiller called Dr. Young for orders and Dr. Young immediately directed that Jacobs be taken to the emergency department at Hershey Medical Center;[14] (37) at the Hershey Medical Center, attempts were made for a Foley catheterization of Jacobs but the attempts were unsuccessful and Jacobs was provided with a suprapubic catheter under conscious sedation; (38) Jacobs was returned to the Dauphin County Prison the following day; (39) on January 30, 2012, Dr. Young performed a follow-up evaluation of Jacobs and Jacobs reported that he was feeling much better, though he was a little weak and sore; (40) on February 8, 2012, Dr. Young examined Jacobs and his assessment was that Jacobs suffered from mixed connective tissue disease, nephrotic syndrome and suffered from a urinary obstruction; (41) Dr. Young observed that the suprapubic catheter was in place and he informed Jacobs that he would be going to see a nephrologist and he should continue his current medical regime, i.e., the suprapubic catheter, prednisone and the antibiotic Keflex, pending evaluation by the nephrologist; and (42) on February 9, 2012, Jacobs was released from the Dauphin County Prison and he was no longer under the care of Dr. Young.

---

14.   Doc. No. 47-1, at 73.

## IV.  Discussion

To establish an Eighth Amendment claim under § 1983, Jacobs must show that the prison official acted with "deliberate indifference" to a substantial risk of serious harm.  Farmer v. Brennan, 511 U.S. 825, 827 (1994) (citing Helling v. McKinney, 509 U.S. 25 (1993); Wilson v. Seiter, 501 U.S. 294 (1991); Estelle v. Gamble, 429 U.S. 97 (1976)).  In other words, the official must know of and disregard an excessive risk to inmate health or safety.  Natale v. Camden County Corr. Facility, 318 F.3d at 582; Farmer, 511 U.S. at  837.  This standard "affords considerable latitude to prison medical authorities in the diagnosis and treatment of the medical problems of inmate patients.  Courts will 'disavow any attempt to second guess the propriety or adequacy of a particular course of treatment. . . which remains a question of sound professional judgment.'"  Little v. Lycoming County, 912 F. Supp. 809, 815 (M.D. Pa. 1996) (quoting Inmates of Allegheny County Jail v. Pierce, 612 F.2d 754, 762 (3d Cir. 1979)).

Claims based upon the Cruel and Unusual Punishments Clause have both objective and subjective components.  Wilson v. Seiter, 501 U.S. at 298.  Serious hardship to the prisoner is required to satisfy the Eighth Amendment's objective component.  Id.  The subjective component is met if the person or persons

12

causing the deprivation acted with "a sufficiently culpable state of mind".  Id.

The objective component of an Eighth Amendment medical care claim, i.e., whether a plaintiff's medical needs were serious, has its roots in contemporary standards of decency. Hudson v. McMillian, 503 U.S. 1 (1992).  A medical need is serious if it is one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Johnson v. Busby, 953 F.2d 349, 351 (8th Cir. 1991); Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987); Ramos v. Lamm, 639 F.2d 559, 575 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981); West v. Keve, 571 F.2d 158, 162-63 n.6 (3d Cir. 1978).  The serious medical need element contemplates a condition of urgency, one that may produce death, degeneration, or extreme pain.  See Monmouth County Correctional Institution Inmates v. Lanzaro, 834 F.2d at 347; Archer v. Dutcher, 733 F.2d 14, 16-17 (2d Cir. 1984); Todaro v. Ward, 565 F.2d 48, 52 (2d Cir. 1977).

Further, a complaint that a physician or a medical department was "negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." Estelle, 429 U.S. at 106.  More than

two decade ago, the Third Circuit held that "[w]hile the distinction between deliberate indifference and malpractice can be subtle, it is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights." Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990); see also Spruill, 372 F.3d at 235 ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation.").

As required under Estelle an inmate plaintiff must demonstrate that prison officials have breached the standard of medical treatment to which he was entitled. The government has an "obligation to provide medical care for those whom it is punishing by incarceration." Id. at 103. However, a constitutional violation does not arise unless there is "deliberate indifference to serious medical needs of prisoners" which constitutes "unnecessary and wanton infliction of pain." Id. at 104 (citation omitted)

Even if the court assumes that Jacobs' medical needs were serious in the constitutional sense, the summary judgment record reveals that he received medical attention. It is clear from Dr. Jones' expert report that Dr. Young responded to medical requests from Jacobs and provided Jacobs with appropriate medical care. The morning of January 28, 2012, Dr. Young was advised of

14

Jacobs' urinary tract complaints.  Dr. Young ordered laboratory
work and received the results of that laboratory work at about
2:00 p.m.  After reviewing the result Dr. Young directed that
Plaintiff be placed on an antibiotic and that his condition be
monitored.  Once informed by medical personnel of Jacobs'
discomfort and continued urine retention at approximately 9:30
p.m. on January 28, 2012, Dr. Young directed that Jacobs be
transported to the Hershey Medical Center.  Furthermore, according
to Dr. Jones, Dr. Young provided Jacobs with appropriate care once
he was returned to the Dauphin County Prison until he was released
on February 9, 2012, as well as during Jacobs' period of
confinement from September 24, 2012 to March 26, 2013.[15]  At best,
the summary judgment record demonstrates Jacobs' mere disagreement
with the scope and extent of treatment by Dr. Young.  Jacobs'
disagreement with the course of treatment, however, does not serve
as a predicate to liability. See White v. Napoleon, 897 F.2d at
108-110 (No deliberate indifference claim is stated when a doctor
disagrees with the professional judgment of another doctor since
"[t]here may, for example, be several acceptable ways to treat an
illness."); Inmates of Allegheny County Jail v. Pierce, 612 F.2d

---

15.  Dr. Young's statement of material facts addresses this
period of confinement in paragraphs 25 through 56.  As stated
because Jacobs failed to respond to the statement in accordance
with Local Rule 56.1, the paragraphs are admitted by Jacobs.  The
court incorporates herein by reference those paragraphs.

at 762(claim for deliberate indifference does not arise just because one doctor disagrees with the diagnosis of another).

The summary judgment record establishes efforts by the Dr. Young to provide Jacobs with necessary medical care, and an attendant mental state that falls short of deliberate indifference.  A reasonable fact finder could not conclude that Dr. Young acted with deliberate indifference to Jacobs' medical needs.

An appropriate order will be entered.